45 P.3d 1219

**BED MART, INC., an Arizona corporation, Plaintiff–Appellee–Cross–Appellant,**

v.

**Michael O'Hara KELLEY, Defendant–Appellant–Cross–Appellee.**

No. 1 CA–CV 01–0275.

Court of Appeals of Arizona,
Division 1, Department C.

March 28, 2002.

Redesignated as Opinion May 13, 2002.

Munger Chadwick, P.L.C., by Michael S. Green and Laura P. Chiasson, Tucson, for Plaintiff–Appellee–Cross–Appellant.

Jaburg & Wilk, P.C., by Herman A. Israel, Phoenix, for Defendant–Appellant–Cross–Appellee.

## OPINION

EHRLICH, Judge.

¶ 1 Michael O'Hara Kelley appeals from the trial court's finding that he was not wrongfully enjoined by Bed Mart, his former employer, from working for Sleep America, one of its competitors. He further appeals from the court's denial of his request for attorneys' fees and costs. Bed Mart cross-appeals from the court's determination that the covenant not to compete in its employment agreement with Kelley was invalid and its award of lost wages to Kelley. For reasons discussed below, we reverse the court's finding that the non-compete provision is invalid, thereby reversing also its award of lost wages to Kelley and making moot the issue regarding an award of fees and costs to Kelley.

## *FACTUAL AND PROCEDURAL BACKGROUND*

¶ 2 Bed Mart hired Kelley as a salesperson in January 2000. He had to sign a "Covenant Not To Compete And Maintain Confidentiality Of Trade Secrets Of Employer" ("Covenant") that contained the following provision:

Employee covenants that employee will not, during the term of the employment relationship, directly or indirectly engage in sales of beds and/or mattresses, or in any other line of business carried on or contemplated by employer during employee's employment with employer, nor assist, directly or indirectly, any third party to do so. *Nor shall employee do so, for the benefit of any business for which the sale of mattresses accounts for more than fifty percent (50%) of sales revenue, for a period of six months following termination (for any reason) of employee's employment with employer within ten (10) miles of any location where employer conducts*

*business.* In the event that said restriction is deemed unreasonable by a court of law, the parties agree that the time and scope of the restriction shall be enforced by a court in the most restrictive manner which is reasonable.

¶ 3 The Covenant also contained a confidentiality provision:

Employee agrees that employer's customer lists, names of dealers, training and operations manuals, business data, practices, plans, methods, procedures and strategies, whether acquired or in existence prior to or after the execution of this agreement, constitute trade secrets and are the property of BED MART, INC. which may not be disclosed or used by employee for any purpose except the business of employer.

Employee shall not ever, for any period, during or after employment, in any location, directly or indirectly communicate to any third party or corporation any customer lists, names of dealers, training and operations manuals, business data, practices, plans, methods, procedures or strategies or any other information or trades secrets of the employer.

¶ 4 Finally, the Covenant contained a damages provision:

... in the event employee breaches this covenant, the exact amount of damages will be difficult to establish and therefore employee will pay employer, as liquidated damages, One Thousand Dollars ($1,000) for each week or part of each week that such breach continues, and in addition employer shall be immediately entitled to an injunction prohibiting employee from continuing such breach.

¶ 5 In July 2000, Kelley ended his employment with Bed Mart and went to work as a salesperson for Sleep America. Bed Mart filed a complaint against Kelley alleging breach of contract and misappropriation of trade secrets, and seeking injunctive relief. It also obtained a temporary restraining order ("TRO") prohibiting Kelley from working for Sleep America or from using Bed Mart's trade secrets until the trial court could hold a hearing.

¶ 6 Kelley moved to dismiss the case, arguing that Bed Mart could not demonstrate its entitlement to injunctive relief and that the non-compete provision of the Covenant was overly broad in both geographical scope and duration. The trial court denied the motion, and the matter proceeded to an evidentiary hearing.

¶ 7 The trial court concluded that the non-compete provision of the Covenant was overly broad in geographical scope and, therefore, invalid. However, the court found the confidentiality provision of the Covenant enforceable. It entered an order to that effect, dissolved the TRO and ordered Bed Mart to pay Kelley $9,230.80 for wages lost as a result of the TRO. It further prohibited Kelley, to the extent he was in possession of any confidential information, from disclosing it to any third parties.

¶ 8 Kelley filed a Motion to Alter or Amend the Judgment/Motion for Reconsideration/Motion for New Trial, arguing that he was entitled to attorneys' fees under the injunction bond. The trial court denied the motion, holding that, because "preliminary relief appeared justified for a time[,]" there was "no abuse of legally available remedies."

¶ 9 Kelley and Bed Mart both appealed, raising these issues:

1. Whether the trial court erroneously found the non-compete provision of the Covenant unenforceable as a matter of law;
2. Whether the trial court properly found that Kelley was not wrongfully enjoined because injunctive relief appeared justified for a time;
3. Whether the court erroneously awarded Kelley lost wages;
4. Whether the court properly refused to award Kelley attorneys' fees and costs incurred in dissolving the injunction pursuant to Arizona Rule of Civil Procedure ("Rule") 65(c);[1] and
5. Whether the court properly refused to award Kelley his attorneys' fees pursuant to Arizona Revised Statutes ("A.R.S.") § 12–341.01(A) as the prevailing party in an action arising out of contract.

**1.** Kelley has mistakenly characterized this issue as one involving Rule 65(e), which requires a

## DISCUSSION

### A. The Non–Compete Provision

¶ 10 Bed Mart asserts that the trial court erroneously held the non-compete provision of its Covenant invalid. We agree.

¶ 11 The trial court held that Bed Mart's covenant not to compete was unenforceable as a matter of law because its geographical scope was too broad. The court was not swayed by the provision's limitation to mattress stores, concluding that either a geographic scope is too broad or it is not, but it cannot be saved by "[c]arving non-specialty areas out of the prohibited lines of work...." While not ruling on the issue of duration, the court also characterized the six-month period as "marginal" and suggested that three or four months might have been a more appropriate time limit.

¶ 12 A covenant not to compete in an employment agreement is "valid and enforceable by injunction when the restraint does not exceed that reasonably necessary to protect the employer's business, is not unreasonably restrictive of the rights of the employee, does not contravene public policy, and is reasonable as to time and space." *Phoenix Orthopaedic Surgeons, Ltd. v. Peairs,* 164 Ariz. 54, 57, 790 P.2d 752, 755 (App.1989), *disapproved on other grounds, Valley Med. Specialists v. Farber,* 194 Ariz. 363, 982 P.2d 1277 (1999). A restrictive covenant is reasonable and enforceable when it protects some legitimate interest of the employer beyond the mere interest in protecting itself from competition such as preventing "competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment." *Farber,* 194 Ariz. at 367 ¶ 12, 982 P.2d at 1281 (quoting Harlan M. Blake, *Employee Agreements not to Compete,* 73 HARV. L.REV. 625, 647 (1960)). An employer may also have a legitimate interest in having a "reasonable amount of time to overcome the former employee's loss, usually by hiring a replacement and giving that replacement time to establish a

bond to secure injunction, whereas Rule 65(c) is the rule for motions to dissolve injunctions.

working relationship." *Id.* at 370 ¶ 25, 982 P.2d at 1284 (quoting Blake, *supra*, 73 HARV. L.REV. at 659).

¶ 13 In reviewing the trial court's invalidation of the non-compete provision, we review mixed questions of law and fact de novo; we are not bound by legal conclusions from facts found or inferred in its judgment. *See Huskie v. Ames Bros. Motor & Supply Co.*, 139 Ariz. 396, 401, 678 P.2d 977, 982 (App. 1984). This includes the court's construction of an employment contract. *Peairs*, 164 Ariz. at 57, 790 P.2d at 755.

¶ 14 Bed Mart had several legitimate interests buttressing its covenant not to compete. Its chief concern was its salespersons' access to the company's "Product Bible," which contains information about all the merchandise in the stores and the wholesale prices of those items, as well promotional deals from suppliers.[2] The employees also received information regarding advertising promotions, special deals and other marketing strategies months in advance. Bed Mart did not want its five or six direct competitors, including Sleep America, to have this information, and it was afraid disclosure would be inevitable if its former employees worked for one of its competitors. For instance, a former Bed Mart employee working at Sleep America would have an advantage in preempting a Bed Mart product promotion or in underbidding Bed Mart, all information he would know from the Product Bible.

¶ 15 Bed Mart presented evidence that the bedding industry is very competitive. Indeed, Sleep America's sales manager admitted that Sleep America sends employees to competitors to comparison shop. Since manufacturers have different prices for different dealers and dealers do not know each other's prices, knowledge of a competitor's margins is a valuable competitive tool. In fact, Sleep America also considers its financial information, sales volume figures and marketing strategies to be confidential, and it similarly requires employees to sign a six-month confidentiality agreement.

¶ 16 Bed Mart argues that the six-month scope is reasonable because (1) it takes approximately six months for it to hire and train a new employee to be profitable for the company[3] and (2) it revises its Product Bible with new merchandise, cost and promotional information approximately every six months—thereby rendering somewhat obsolete any information a former employee may have gleaned from the Product Bible after six months have elapsed from the employee's termination of employment at Bed Mart.

¶ 17 Kelley asserted that the geographical scope was unreasonable because, due to the placement of Bed Mart stores in the Phoenix area, the restriction of "ten-mile[s] from any Bed Mart store" essentially precluded him from selling mattresses in the entire Phoenix metropolitan area.[4] However, the non-compete provision only applies to "any business for which the sale of mattresses accounts for more than fifty percent (50%) of sales revenue...." Accordingly, the Covenant did not prohibit Kelley from working in his chosen employment. He could have continued selling mattresses at hundreds of other bedroom, furniture or department stores in the Phoenix area. He simply could not work at the five or six mattress superstores that are the direct competitors of Bed Mart and located within ten miles of a Bed Mart store.[5]

2. Bed Mart provides its sales staff with this information because each salesperson has complete authority to determine the price at which a product is sold to a customer, including authority to discount any listed price if needed to make the sale. Because Bed Mart employees are paid 20% commission on the net profits of their sales, by knowing and controlling the profits from their sales, it is presumed that the salesperson will maximize his profits, thereby maximizing Bed Mart's profits. This profit structure is not known by Bed Mart's competitors.

3. Similarly, Sleep America had a formal training program for its sales associates that lasted at least sixty days, and it acknowledged it needed approximately six months to determine that the last three people it terminated for low productivity should be fired.

4. The Covenant precludes former employees from working at "any business for which the sale of mattresses accounts for more than fifty percent (50%) of sales revenue ... within ten (10) miles of any location where employer conducts business."

5. Alternatively, Kelley could have applied his sales training to a variety of other products be-

¶ 18 The limitation to mattress stores reasonably restricts the effective scope of the Covenant. Because of that limitation, Kelley was not precluded from obtaining employment in his specific area of sales expertise in the Phoenix area. Therefore, the non-compete provision was reasonable and should have been upheld. *See Peairs,* 164 Ariz. at 60, 790 P.2d at 758; *see also Farber,* 194 Ariz. at 370–71 ¶¶ 25–27, 982 P.2d at 1284–85 (distinguishing the restrictive covenant at issue from the one in *Peairs* because the latter only prevented doctor from practicing particular specialty area, not all fields of medicine).

¶ 19 The trial court did not specifically rule on the reasonableness of the duration of the non-compete provision, but it questioned its length. The reasonableness of this provision is supported by evidence that (1) it takes Bed Mart six months to train a new employee to the point of making a profit for the company [6] and (2) Bed Mart's concern about former employees' intentional or inadvertent use of confidential pricing and promotional information significantly decreases after six months in light of revisions to its Product Bible. As noted in *Amex Distributing Co. v. Mascari,* 150 Ariz. 510, 518, 724 P.2d 596, 604 (App.1986), restraints in the commercial context are reasonable in duration for the time necessary for the employer to put a new employee on the job and for the new employee to have a reasonable opportunity to demonstrate his effectiveness to the customers. *See Enter. Leasing Co. of Phoenix v. Ehmke,* 197 Ariz. 144, 149–50 ¶¶ 18–21, 3 P.3d 1064, 1069–70 (App.1999)(recognizing that company's internal economic records, like profit-and-loss figures and sales revenue, may constitute protectable trade secrets that competitor could use to advantage in pricing and sales decisions); *Bryceland v. Northey,* 160 Ariz. 213, 216, 772 P.2d 36, 39 (App.1989)(noting employer's legitimate interest in restraining former employee's employment that entails use of valuable trade information and confidential information obtained in prior job).

¶ 20 We also do not find any public-policy impediments to Bed Mart's non-compete provision. While such provisions are generally disfavored as restraints of trade, *Farber,* 194 Ariz. at 367 ¶ 12, 982 P.2d at 1281, the non-compete provision at issue did not preclude Kelley from continuing to engage in his chosen employment, the sale of mattresses—or other bedding or furniture, in the Phoenix metropolitan area. Nor is there any evidence Kelley was financially prejudiced by the restraint provision. Further, the same public-policy concerns are not inherent in this case as in cases involving non-compete restrictions on certain professions such as medicine in which issues regarding patients' rights to free choice of care come into play. *See id.* at 368–69 ¶¶ 14–19, 982 P.2d at 1282–83.

¶ 21 The opinions Kelley relies on are distinguishable from his case. For example, in *Olliver/Pilcher Ins., Inc. v. Daniels,* 148 Ariz. 530, 532, 715 P.2d 1218, 1220 (1986), the restrictive covenant was struck because its statewide scope was overly broad and unreasonably restricted the right of the employee to work in his chosen occupation, whereas Kelley could continue to sell mattresses or related or similar products at hundreds of stores in the Phoenix metropolitan area. In *Amex Distributing Co.,* 150 Ariz. at 518, 724 P.2d at 604, the court found the 36–month duration without "justification in the evidence," but Bed Mart presented bona fide grounds for the significantly shorter time period, six months, of its restrictive covenant. Thus, contrary to Kelley's assertions, the law supports the reasonableness of the restrictive covenant at issue. *See, e.g., Bryceland,* 160 Ariz. at 216, 772 P.2d at 39 (recognizing restrictive covenants may be used to protect employee's use of confidential information); *Amex Distributing Co.,* 150 Ariz. at 518, 724 P.2d at 604 ("Courts seldom criticize restraints of six months or a year on the grounds of duration ....")(quoting Blake, *supra,* 73 HARV. L.REV. at 677).

cause the Covenant only precluded him from working at a business deriving most of its revenue from the sale of mattresses.

6. Bed Mart employees testified that they undergo six months of formal on-the-floor training in products, specifications and product costs. Bedding industry executives testified that this kind of training is routine in the industry.

### B. Kelley's Lost Wages

¶ 22 The trial court awarded Kelley $9,230.80 for lost wages during the term of the TRO based solely on its finding that the non-compete provision of the Covenant was unenforceable as a matter of law. Because the non-compete provision was enforceable, we vacate this award.

### C. Kelley's Attorneys' Fees and Costs

¶ 23 Kelley asserts that, because the trial court found the non-compete provision invalid and dissolved the TRO, he was wrongfully enjoined. He further asserts that he was therefore entitled to his attorneys' fees and costs incurred in dissolving the TRO either as a wrongfully enjoined party pursuant to Rule 65(c) or as the prevailing party in an action arising out of contract pursuant to A.R.S. § 12–341.01(A). In light of our conclusion that the court erroneously found the non-compete provision invalid, we need not address these contentions.

### D. Bed Mart's Attorneys' Fees

¶ 24 Bed Mart requests an award of its attorneys' fees on appeal pursuant to Arizona Rule of Civil Appellate Procedure 21(c). This rule only sets forth the procedure for requesting fees; it does not provide a substantive basis for a fee award. *Mission Ins. Co. v. Cash, Sullivan & Cross,* 170 Ariz. 105, 110–11, 822 P.2d 1, 6–7 (App.1991), *disapproved on other grounds, Panzino v. City of Phoenix,* 196 Ariz. 442, 999 P.2d 198 (2000). Therefore, we deny Bed Mart's request.

### CONCLUSION

¶ 25 The trial court erred in finding the non-compete provision of the Covenant unenforceable. Accordingly, we reverse that portion of the trial court's order and vacate the corresponding wage award to Kelley.

CONCURRING: DANIEL A. BARKER, Judge and PHILIP HALL, Judge.